AO 91 (REV.5/85) Criminal Complaint  AUSAs Manish Shah (312) 353-0517 and Stephanie Zimdahl (312) 469-6314

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FILED
11-30-09
NOV 30 2009
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

JEREMY BLACKBURN

**CRIMINAL COMPLAINT**

CASE NUMBER:

**09 CR 976**

<u>UNDER SEAL</u>  MAGISTRATE JUDGE NOLAN

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: Beginning no later than in or around March 2009, and continuing until November 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, JEREMY BLACKBURN, defendant herein:

devised, intended to devise and participated in a scheme to defraud and to obtain money and property, by means of materially false and fraudulent pretenses and representations, and in furtherance thereof, on or about July 15, 2009, did knowingly cause to be transmitted in interstate commerce, by means of a wire communication, certain signs and signals, namely, a wire transfer of approximately $60,573,249 from Chicago, Illinois to Santa Clara, California;

in violation of Title 18, United States Code, Sections 1343 and 2. I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
BRENT POTTER
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

November 30, 2009                    at    Chicago, Illinois
Date                                        City and State

NAN R. NOLAN, U.S. Magistrate Judge          _____
Name & Title of Judicial Officer              Signature of Judicial Officer

UNITED STATES DISTRICT COURT )
) SS
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Brent Potter, first being duly sworn under oath, hereby depose and state as follows:

### Introduction

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the Chicago Field Division. I have been employed by the FBI as a Special Agent for approximately twelve years. At this time, I am assigned to an FBI squad dedicated to the investigation of federal wire and mail fraud offenses, as well as related financial crimes.

2. This affidavit is submitted in support of a criminal complaint alleging that JEREMY BLACKBURN ("BLACKBURN") has committed wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the attached criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information obtained from other law enforcement agents and government employees who have been involved in this investigation, and a review of publicly available documents and websites, financial,

1

accounting and banking documents, and correspondence obtained during the course of this investigation.

## CANOPY FINANCIAL

4. At times material to this Complaint:

   a. Canopy Financial, Inc. ("Canopy Financial" or "Canopy") was a Delaware corporation, formed in 2004. Canopy Financial developed and provided programs for banks and health care payers for payment processing and administration of health-related accounts such as Health Savings Accounts and Flexible Spending Accounts. Canopy's products related to, among other things, expense tracking, online bill payment, Automated Clearing House processing, and account management for healthcare transactions. Canopy maintained offices in San Francisco, California; Plainsboro, New Jersey; and Chicago, Illinois. Canopy Financial maintained several bank accounts, at least one of which was with the Northern Trust Company ("Northern Trust"). Northern Trust sent bank statements to Canopy Financial at its Chicago office at 230 W. Monroe, Suite 2330, Chicago, IL 60606.

   b. JEREMY BLACKBURN was a co-founder of Canopy Financial. BLACKBURN was also the President and Chief Operating Officer of Canopy Financial. According to Canopy's website, as President and Chief Operating Officer, BLACKBURN led the day-to-day business operations, sales, account management, marketing, engineering and product development activities of the company. Also according to Canopy's website, prior to joining Canopy Financial, BLACKBURN had served as a division CEO for an

advanced technology business and as Vice President of Global Professional Services for another corporation. BLACKBURN had a Masters of Business Administration from the University of Chicago Graduate School of Business.

    c.    In addition to BLACKBURN, according to Canopy Financial's website, another co-founder of Canopy Financial was the corporation's Chief Executive Officer ("Individual A").

    d.    Individual B was a third co-founder of Canopy Financial. Individual B was also the Chief Technology Officer of Canopy Financial. According to Canopy's website, prior to joining Canopy Financial, Individual B served in executive positions at other corporations.

## THE CANOPY STOCK PURCHASE AGREEMENT

5.    In 2009, Canopy Financial and several other parties entered into a deal (the "Canopy Stock Purchase Agreement") whereby the parties agreed to purchase shares of Canopy Financial's Series D preferred stock on two separate closing dates. The Canopy Stock Purchase Agreement also provided for the redemption of a significant portion of the Series B stock of one of Canopy Financial's corporate investors, and certain of Canopy Financial's Series A and Common stockholders (including BLACKBURN, Individual A, and Individual B) were given the opportunity to redeem up to ten percent of their stock.

6.    Pursuant to the terms of the Canopy Stock Purchase Agreement, on July 15, 2009, Canopy issued and sold over $63 million of its Series D Preferred Stock to multiple

entities, including two entities affiliated with Spectrum Equity Investors, an investment firm with offices in Boston, Massachusetts and Menlo Park, California ("Spectrum"). On the date of the second closing, August 19, 2009, Canopy issued and sold almost $12 million of its Series D Preferred Stock to multiple entities, again including the two entities affiliated with Spectrum. Also on August 19, 2009, Canopy Financial purchased an aggregate of almost $12 million of its Series A Preferred and Common Stock from various stockholders. Included among those Series A Preferred and Common Stockholders who redeemed a portion of their stock were BLACKBURN and Individual B. *See* ¶ 10 below.

7.  Among other terms, the Canopy Stock Purchase Agreement stated that Canopy Financial provided the purchasers of the Series D Preferred Stock, including Spectrum, with Canopy Financial's audited financial statements for the fiscal year ended December 31, 2008.

## OVERVIEW OF THE SCHEME

8.  As set forth in more detail below, beginning no later than March 2009 and continuing until in or about November 2009, BLACKBURN devised and participated in a scheme to defraud and to obtain money from investors, including Spectrum, through the creation and distribution of false and fraudulent information concerning Canopy's financial condition and a purported audit of Canopy Financial for the years ended December 31, 2007 and 2008.

9.  As described below, BLACKBURN caused the creation of fraudulent audit documents and bank statements for Canopy that falsely represented the financial health of

4

the company. BLACKBURN then caused the documents to be sent to Spectrum as part of the documents required for the closing of the Canopy Stock Purchase Agreement.

10. As a result, in part, of these misrepresentations concerning Canopy's financial condition, Spectrum wire transferred over $60 million to Canopy in July 2009 in order to purchase shares of Canopy Financial. In August 2009, at the second closing, BLACKBURN obtained approximately $1.6 million through the redemption of shares he owned in Canopy. Individual B obtained approximately $975,000 at the August 2009 closing, through the redemption of shares he owned in Canopy.

11. Finally, as set forth below, after the receipt of Spectrum's investment, BLACKBURN obtained additional money and property through unauthorized transfers from Canopy Financial's accounts.

## THE FRAUDULENT DOCUMENTS

*The Purported Auditors' Report*

12. KPMG is an international network of firms providing audit, tax and advisory services. Among the services provided by KPMG are independent audits of a company's financial condition. Reports issued in connection with such audits generally contain an opinion from KPMG that certain financial statements fairly present the financial position of the company. Another service provided by KPMG is a SAS 70 report. A SAS 70 (Statement of Auditing Standards No. 70) Report is designed to provide information about the internal

5

controls in place at the audited company. A SAS 70 report is not an audit of a company's financial condition.

13. KPMG provided SAS 70 Report services to Canopy Financial. As set forth below at ¶ 22, KPMG did not audit Canopy's financial statements nor issue an independent auditor's report about Canopy.

14. On March 27, 2009, a partner at KPMG emailed an example of an Independent Auditors' Report prepared by KPMG, as well as other sample documents, to Canopy Financial's Chief Administrative Officer. On March 30, 2009, Canopy's Chief Administrative Officer forwarded the sample Independent Auditors' Report, and other related documents, to Individual B via email.

15. On April 13, 2009, BLACKBURN sent an email with the subject line "Ghost write" to Individual B. The email stated, "Im [sic] going to ghost write a note for you to send to [Individual A] and I re: KPMG today. Remember you're supposed to be spending time with them today...cool?" Later in the same day, BLACKBURN sent a second email to Individual B with the subject line "Ghost Written Note" which stated:

> Send to [Individual A] and JB
> \*\*\*\*\*\*\*\*\*\*\*
>
> Guys,
>
> I spent the day with the auditors and we still have a list of things that are outstanding and we are in the way. We have to re-inventory all of the assets that were acquired as part of CG and get confirm on the useful life of each technology asset. The auditors are not satisfied that the depreciation schedule for the assets is satisfactory. We also have to get confirmation letters for all prepaid accounts that we use for ACH. Finally, we are pulling all T&M hours

for Q4, specifically those hours that were spent with BHB in connection with the transition services agreement. This is a pain in the ass and does require some manual work on our end. We have to reconcile this with the open invoices.

All of these are in my camp as to-dos. I know this is an open item for us so I will be working this week to get these things knocked out. JB, I'll need your help on #3 above as we reconcile hours but we can discuss that in the morning. I don't have a new ETA because we are in the way. I do know that they can't make any more progress until we get these done so I'm going to stop typing and start working.

16.    Prior to the first closing date of the Canopy Stock Purchase Agreement, on June 30, 2009, BLACKBURN sent an email to Individual A and attached a document which purported to be an Independent Auditors' Report from KPMG of the audit of Canopy Financial for the years ending December 31, 2007 and 2008 (the "Purported Auditors' Report"). The subject line of the email sent by BLACKBURN reads "Audit FINALLY Complete" and the text of the email states, "See attached. The Type II also has some related commentary on controls so we should always keep together if we can. I never wanna go through this again!!"

17.    The Purported Auditors' Report attached to the email is addressed to "The Board of Directors, Canopy Financial," is dated June 29, 2009, and is on letterhead that purports to be that of KPMG. The Purported Independent Auditors' Report states that KPMG has audited the consolidated balance sheets of Canopy Financial as of December 31, 2008 and 2007 and the related consolidated statements of operations and cash flows for the years then ended. The Purported Auditors' Report further states that, in the opinion of

KPMG, the consolidated financial statements of Canopy Financial "present fairly, in all material respects, the financial position of Canopy Financial as of December 31, 2008 and 2007, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles." Attached to the Purported Auditors' Report are what purport to be Canopy's consolidated financial statements for December 31, 2008 and 2007, including balance sheets, statement of operations, statements of cash flows, and notes to the consolidated financial statements.

18. As noted above in ¶ 7, the receipt of audited financial statements was a term of the Canopy Stock Purchase Agreement. The Purported Auditors' Report claimed that Canopy had over $23 million in total assets and $5.9 million in total liabilities at the end of the fiscal year 2008.

19. On June 30, 2009, Individual A forwarded the Purported Auditors' Report to a managing partner of an investment banking firm involved in the stock purchase who then sent the document on, via email, to representatives at Spectrum.

*Individual B Sends the Purported Auditor's Report to Ridgestone Bank*

20. In July 2008, Individual B opened an account at Ridgestone Bank, ostensibly for the purpose of holding Health Savings Account participant funds for a Canopy client. In 2009, Ridgestone Bank questioned the declining balances in the account, and asked Individual B to provide an audited financial statement for Canopy.

21. On June 12, 2009, Individual B sent a Purported Auditors' Report (one that purported to be authored by KPMG, contained the same numbers as the report referenced in ¶ 17 above, and was dated June 11, 2009), via email, to Ridgestone Bank. In the accompanying text of the email, Individual B wrote, "Attached is the latest we had issued. [. . .] feel free to contact Jeremy if you have any questions."

*KPMG Learns of the Purported Auditors' Report*

22. In fact, according to KPMG, the firm never performed an audit of Canopy's financial condition and the firm never drafted any Independent Auditors' Report for Canopy Financial, including the Purported Auditors' Report. When KPMG learned of the Purported Auditors' Report, the firm sent a Cease and Desist letter to Canopy Financial on November 3, 2009, wherein KPMG stated, among other things, that it had not performed audits of Canopy's financial statements at any time.

23. According to an employee of Canopy Financial who spoke to Individual A, on or about November 5, 2009, BLACKBURN admitted to Individual A that BLACKBURN created the KPMG Auditors' Report and attached financial statements. BLACKBURN also stated that the numbers were accurate.

24. On November 12, 2009, Canopy Financial, through its General Counsel, sent a letter to Spectrum which stated:

> Canopy Financial, Inc. previously provided to you documents referring to KPMG and purporting to be a KPMG Independent Auditors' Report and related financial statements for fiscal 2007 and 2008 (the "Subject Documents"). I write to advise you that i) the Subject Documents were not

authorized by, nor consented to, by KPMG; ii) KPMG has never provided audit services to Canopy relating to Canopy's financial statements; and c) you cannot rely on the Subject Documents in making or holding any investment in or having any other business dealings with Canopy.

*The Purported Northern Trust Bank Statements*

25. Prior to the July 15, 2009 closing (at which Spectrum invested over $60 million in Canopy), Spectrum asked Canopy to provide Canopy's bank statements to Spectrum.

26. On July 14, 2009, Individual B sent a representative of Spectrum, via email, documents which purported to be Statements of Account for a Canopy Financial bank account at the Northern Trust Company ("Northern Trust") for the months January through May 2009 (the "Purported Northern Trust Bank Statements"). Each of the Purported Northern Trust Bank Statements represented that the account belonged to "Canopy Financial" and referenced account number "XXXXX601."

27. The Purported Northern Trust bank Statements for January through May 2009 represented closing balances in the "601" account of between $5.7 and $7.9 million.

28. On July 14, 2009, BLACKBURN sent a representative of Spectrum, via email, a document which purported to be a Statement of Account for a Canopy Financial bank account at Northern Trust for the period covered June 1, 2009 through June 30, 2009 (the "Purported June Northern Trust Bank Statement"). The Purported June Northern Trust Bank Statement represented that the account belonged to

"Canopy Financial" and referenced account number "XXXXX601." Among other things, the Purported June Northern Trust Bank Statement showed an opening balance of $7,986,458.29, deposits received of $5,013,641.44, checks/drafts paid of zero dollars, other charges of $4,000,690.22, and a closing balance of $8,999,409.51.

29. In fact, according to Northern Trust, Canopy did not have at any time in 2009 an account with the account number "XXXXX601." An account numbered "XXXXX601" does exist, but it is associated with another of Northern Trust's clients, not Canopy Financial. According to Northern Trust, Canopy Financial does have an account with Northern Trust with the account number "XXXXX602" which, for the period covered June 1, 2009 through June 30, 2009, had an opening balance of $92,890.64 and a closing balance of $86,952.35. Based on my review of the documents, the "602" account at Northern Trust is not a Canopy Financial operating account, but is an account for the benefit of one of Canopy's Health Savings Account clients, a healthcare insurance company.

*Blackburn Attempts to Use Fake Northern Trust Statements to Obtain a Mortgage*

30. In or about late July 2009, BLACKBURN applied for a mortgage on a new home in Malibu, California. A representative of the mortgage lender informed Northern Trust that BLACKBURN submitted a Northern Trust bank statement that purported to be a statement for a personal bank account of BLACKBURN's. The mortgage lender contacted Northern Trust to verify the bank statement. This bank statement again bore the account number "XXXXX601," but bore the name JEREMY

11

BLACKBURN. The bank statement again purported to document the period covered June 1, 2009 through June 30, 2009 and reflected a closing account balance of $8,999,409.51. As stated above, no Canopy account ending in "601" exists and the actual Canopy client account ending in "602" had a balance of approximately $87,000 at the end of June 2009.

31.  Northern Trust determined that the "601" account statement submitted in connection with the BLACKBURN mortgage was falsified. In August 2009, Northern Trust contacted Canopy to notify Canopy of the falsified bank statement. BLACKBURN spoke to a representative of Northern Trust and stated that he was not going through with the loan and Northern Trust should destroy all the documentation.

### DISBURSEMENT OF FRAUDULENTLY OBTAINED PROCEEDS

32.  According to an analysis performed by a forensic accounting firm, the proceeds that BLACKBURN fraudulently obtained from Spectrum as a result of the scheme were disbursed in several ways. Among other transfers, well over one million dollars were transferred to an American Express account, a corporate jet leasing company, and a luxury automobile dealership. Additionally, approximately $1.17 million was collectively transferred into two of BLACKBURN's personal bank accounts. A representative of Canopy Financial has stated that these transfers were not authorized by the corporation and did not constitute authorized compensation or expense reimbursement.

## THE EXECUTION WIRE TRANSFER

33. On or about July 15, 2009, Spectrum ordered a wire transfer of funds in the amount of $60,573,249.70, from Harris N.A. in Chicago, Illinois to an account belonging to Canopy Financial at Silicon Valley Bank in Santa Clara, California. The funds constituted a portion of Spectrum's investment in Canopy pursuant to the Canopy Stock Purchase Agreement.

## CONCLUSION

34. Based on the reasons stated above, I submit that there is probable cause to believe that, from beginning no later than in or around March 2009, and continuing until in November 2009, JEREMY BLACKBURN did devise, intend to devise and participate in a scheme to defraud and to obtain money and property, by means of materially false and fraudulent pretenses and representations, and for the purpose of executing that scheme, caused to be transmitted by means of wire communication in interstate commerce, certain signs, sounds and signals, namely a July 15, 2009 wire transfer of funds in the amount of $60,573,249.70 from Chicago, Illinois to Santa Clara, California, in violation of Title 18, United States Code, Sections 1343 and 2.

FURTHER AFFIANT SAYETH NOT.

x _____
BRENT POTTER
Special Agent, Federal Bureau of Investigation

Subscribed and sworn before me this
30th day of November 2009.

_____
NAN R. NOLAN
United States Magistrate Judge